# SUMMERS v. CLARK.

---

PATENTS; INTERFERENCE.

A decision of the Commissioner of Patents in an interference involving an improvement in a door arrangement for dump cars, awarding priority of invention to C. over S., was *reversed,* where it appeared, among other things, that C., who was an employee of S., with free access to his drawings and papers, knew that S. was the patentee of certain

dump cars, and· that his business was that of contracting with railroad companies to furnish those and other cars; that C. was engaged in designing for S. the erection of a plant for the manufacture of such cars, in which plant C. was to have an interest in proportion to the value of such inventions as he might make, which inventions he agreed should be assigned to S.; that C. failed to disclose the invention of the issue to S.; that while C. may have long had in mind the improvement of the dump cars in former use, there was nothing to show that he had a conception of the invention of the issue prior· to his connection with S.; and that while the sets of drawings of the two parties showed considerable differences in details relating to the means of operating the doors, the form of the tracks, the structural details of the doors and the manner of suspending them, such differences did not relate to any material feature of the issue.

No. 772.  Patent Appeals.  Submitted March 15, 1912.  Decided April 1, 1912.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.               *Reversed.*

The facts are stated in the opinion.

Mr. *Frederick W. Winter* for the appellant.

Mr. *Joseph M. Nesbit* and Mr. *Hubert E. Peck* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

This is an interference proceeding involving priority in the matter of an invention consisting of an improvement in a door arrangement for dump cars.  The doors are at the bottom of. the car and devised to roll open laterally of the car, to discharge the load.

The issue of the interference is in seven counts, as follows:—

1. A pair of doors for dump cars movable bodily and inclined and closing together at .their lower edges, oppositely inclined supporting means positioned beneath the center of the

car for the inner portions of the doors, oppositely inclined supports at opposite sides of the car for the outer portions of the doors, and door actuating means.

2. An inclined rolling door for dump cars mounted to roll toward open position without raising its center of gravity, and mechanism for rolling the door.

3. An inclined bodily movable door for dump cars, mounted to vary its inclination while moving without raising its center of gravity, and door moving mechanism.

4. An inclined bodily movable door, and means for increasing the inclination of the door while opening without elevating any part thereof while in contact with the material being dumped.

5. An inclined bodily movable door for a dump car mounted to lower its center of gravity while opening, and door moving mechanism.

6. An inclined rolling door for dump cars mounted to lower its center of gravity while opening, and mechanism for rolling the door.

7. In a bottom for car hoppers, a bodily movable door inclined when closed, supports over which the higher and lower portions of the door move, and arranged to increase the inclination of the door while opening, and actuating means connected to the door above its lowermost portion.

Two applications of Charles H. Clark are involved. The first was filed July 15, 1908, and the second November 4, 1909. The second is a division of an application filed October 5, 1908. Edgar W. Summers filed October 8, 1908.

Summers alleged conception and disclosure April 1, 1903; drawings April 20, 1903; but no actual reduction to practice.

Clark alleged conception of the several counts at different dates as follows: Count 1, July, 1908; count 2, summer 1905; counts 3 to 7, inclusive, April, 1907. Date of reduction to practice of all is alleged as October 1, 1908. The Examiner of Interferences and the Examiners in Chief concurred in awarding priority to Summers. The Commissioner reversed the decisions, and awarded priority to Clark. The decisions

all show careful consideration. We extract from the decision of the Examiner of Interferences the following statement of facts, that are undisputed:

"The record shows that from 1905, or earlier, through the period involved in this controversy, Summers conducted a small office in Pittsburg, Pennsylvania, in which was carried on engineering work of a particular character. This office was conducted by Summers on his own behalf, and that of his copartners Selby, McDonald, and H. H. Summers. The work in which Summers was engaged was the development, manufacture, and sale of improved railway cars and other things connected with them and their manufacture. Summers usually employed a single draftsman in his office, although at times more than one were engaged with him. From April 5th, 1907, until March 20, 1908, Clark, the senior party to this proceeding, was employed by Summers and worked in his office as a draftsman, or designing engineer, at a salary of $250 per month. The office was a small one, of one or two rooms, and the working force never included a stenographer or bookkeeper, Summers and one or two draftsmen always comprising the total force. All of the drawings, the prints, and tracings, excepting those on which work was being done, were stored in a single cabinet or filing case. This case contained several drawers, among which the various drawings and tracings were distributed. It appears that current work and drawings to which constant reference was necessary were stored in one drawer, and finished work to which reference was had only infrequently were kept in another. It is agreed that Clark and the other draftsmen who worked for Summers had free access to all drawings kept in the case. The case was not provided with a lock and no attempt was made by Summers to prevent any of his drawings being freely inspected by those under him."

The Commissioner concurred with the other tribunals in finding that Summers was the first to conceive the invention. This is shown in four drawings made in 1905, which illustrate all the features of the issue.

The evidence shows that these drawings were preserved

among others in the cabinet or case above mentioned as used in Summers' office, to which Clark had free access.

The chief purpose in the employment of Clark by Summers was as an engineer to draw designs for a plant for the construction of cars which Summers had in contemplation. He was also to perform the duties of a draftsman when necessary, and in Summers' absence had charge of the office. The designing of the plant necessitated, to some extent, the examinations of the details of freight car construction. Clark admits that he discussed with Summers certain patents of the latter for punching machines used in car construction, and that one improvement was jointly patented by them. He also said that he carried on the prosecution of certain applications for patents of his own with Summers' knowledge and approval, but had nothing to do with car work in the office other than to prepare a slight alteration of Summers' gravity dump car. He then adds: "For a week or so I did a little work on a center dump car, which was never completed. The bulk of my work had to do with the car plant, for which I made a general layout, consulted with various machinery and materialmen and concerns, and prepared several estimates for different sized plants. In this connection I analyzed the gravity dump car, Summers' gondola car, and the Summers' ore car, as it then appeared from tracings which were in the tracing file in their proper numerical order, as shown by the file index. I did not remove these tracings from the drawer the first time they were taken out, but Mr. Summers got them for me." He positively denied that he had ever gone into the drawer containing the untraced paper drawings, or that he had ever seen them or heard of them during the time of his employment. Clark knew that Summers was the patentee of certain dump cars, and that his business was that of contracting with railway companies to furnish those and other cars. When orders were obtained he had the cars manufactured by others. It was to carry on this manufacture on his own account that he contemplated the erection of the manufacturing plant which Clark had been engaged to design. Clark also testified that

he had an agreement with Summers that all inventions made by him should be his own, and that he was to receive an interest in the manufacturing company to be organized by Summers, in proportion to the value of such inventions as he might make. These inventions he expected to turn over to the corporation.

Summers testified that he showed the drawings of this invention to Clark in discussing dump car construction; and that Clark had seen a photograph of a tracing that embodied certain features of the issue. That the book containing this photograph and others was in the office and accessible to Clark is undoubted. He admits having seen one or more photographs in this book, but not the one mentioned. Clark's preliminary statement alleges conception of counts 3 to 7 in April, 1907, and count 1 in July, 1908. His entry into Summers' office was April 5, 1907, and he remained there until March 20, 1908. The evidence referred to, and some other circumstances not necessary to relate, made it important for Clark to show that he had the conception of count 2 of the issue prior to his connection with Summers, as alleged. In 1905, Clark was chief engineer of the Tennessee Coal & Iron Company, at Ensley, Alabama, where he claims to have made a sketch showing the features called for in count 2. To corroborate this statement he called as a witness one Eugene S. Miller, who was then chief clerk in the construction department of the Coal & Iron Company, which had been using dump cars of Summers' construction. He says that certain proposed changes in the plant for delivering coal to certain gas manufacturers necessitated a new style of dump car, and that he and Clark discussed the features of such a car. That Clark made sketches of his plan, which lay about the office for several weeks, and shortly afterwards disappeared or were thrown away. In the course of his examination he made two sketches, which he said were reproductions of those shown him by Clark. Clark testified that these sketches are correct reproductions of the sketches of the car designed by him. The car was not adopted by the company; nor was any other witness called from that office to corroborate the statement and the existence of the Clark sketch. In view of

the limitation of the reproduced sketches it is unnecessary to comment upon the ability of a witness neither an engineer nor a mechanic, and having no direct concern in the proposed car, to remember distinctly, and reproduce with accuracy, sketches made five years before. The Examiner of Interferences said: "The Miller sketches do not show all of the construction set forth in count 2 of the issue. No mechanism for rolling the doors is shown, nor is such a mechanism referred to by the witnesses as having been considered in 1905." The Examiners in Chief concurred in this, and the Commissioner, who reversed them upon other grounds, said: "While these sketches are not sufficiently complete to prove fully conception of the invention stated in any of the counts, still they do come very close to that covered in count 2."

Clark introduced two other witnesses to prove disclosure by him about the time, or possibly a day or two before, he entered Summers' office to assume the duties referred to. The Examiner of Interferences and the Examiners in Chief both held that this evidence fell far short of showing a disclosure of the invention. The latter say: "The details of these improvements are not delineated by any of the witnesses mentioned, and, in fact, do not appear to have been disclosed either. There is nothing in their testimony to identify the subject-matter of this controversy with that which was mentioned to them by Clark." In this we concur. The Commissioners also say of these communications that they told of designs for dumping car construction, "but without describing the details of such designs."

There is therefore no proof that Clark, though he may have long had in mind the improvement of the dump cars in former use, had a conception of the invention of the issue prior to his connection with Summers. Knowing that Summers had been furnishing dump cars and others built for him by outside manufacturers, and contemplated the construction of a manufacturing plant; and having testified that he was to have his own inventions and to be compensated for them in the stock of the proposed manufacturing company, it seems strange that he

failed to disclose his invention to Summers. The reasons given by him for not doing so are far from being well founded and satisfactory. The Commissioner who found that Clark was an independent, original inventor seems to have been greatly influenced by the fact that while the two sets of drawings equally sustain the claims in issue, there are considerable differences in details relating to the means for operating the doors, the form of the tracks, the structural details of the doors and the manner of suspending them. As these differences in details do not relate to any material feature of the issue, it is unnecessary to consume time in pointing them out, or referring to the different application drawings and comparing them with each other, or the original paper drawings of Summers. It is not unreasonable to suppose that one who has derived an invention from another would, while preserving the essential features, make as great a variation as possible in unessential details. Moreover, it is easily conceivable that an expert could discover some improvements in the details of the original drawings of any newly invented structure.

We are constrained to believe with the Examiner of Interferences and the Examiners in Chief, that Clark is not an independent, original inventor of the invention of the issue. So believing, the decision appealed from will be reversed. It is so ordered, and the clerk will certify this decision to the Commissioner of Patents.    *Reversed.*